COURT OF APPEALS OF VIRGINIA

Present:  Judges Coleman, Annunziata and Bumgardner
Argued at Salem, Virginia


DEBRA J. HAWTHORNE AND
 DANIEL H. HAWTHORNE
                                        OPINION BY
v.    Record No. 1309-99-3      JUDGE ROSEMARIE ANNUNZIATA
                                      AUGUST 1, 2000
SMYTH COUNTY DEPARTMENT OF SOCIAL SERVICES


            FROM THE CIRCUIT COURT OF SMYTH COUNTY
                 Charles H. Smith, Jr., Judge

          Gwen A. Carpenter (Southwest Virginia Legal
          Aid Society, on brief), for appellants.

          Florence A. Powell (Sondra K. Alan, Guardian
          ad litem for the minor child; Freeman
          Associates, on brief), for appellee.


     Debra Hawthorne and Daniel Hawthorne ("appellants") appeal

the decision of the Circuit Court of Smyth County terminating

their residual parental rights to their son, B.H.  Appellants

contend the circuit court erroneously held that recent changes

in Code § 16.1-283 eliminated the duty of the Department of

Social Services (DSS) to consider placing a child with a

relative before terminating parental rights.  Although we find

that the trial court erred, we hold that the error was harmless.

Accordingly, we affirm the trial court's decision.

                         BACKGROUND

     B.H. came into the custody of DSS on February 26, 1997,

pursuant to an order of the Juvenile and Domestic Relations

District Court of Smyth County granting DSS's petition for emergency removal of B.H. from the family home. In addition to appellants' abuse of alcohol, which was the primary factor leading to B.H.'s removal, other factors included domestic violence between Debra and Daniel, their failure to supervise B.H., inadequate parenting skills, irregular employment, and the general instability of the home.

B.H. was initially placed in foster care, first on an emergency basis in the home of Mr. and Mrs. Rob Kilby, and later on February 28, 1997, in the home of Mr. and Mrs. Edward Widener. B.H. remained with the Wideners until June 23, 1997, when he was placed in the home of his elder sister and brother-in-law, Lanina and Delmas Jackson. B.H. lived with the Jacksons until August 18, 1997, when he was returned to his parents' home. DSS retained legal custody of B.H., however.

Appellants and DSS entered into a foster care plan and agreement ("Agreement") on October 31, 1997. The goal of this plan was to assure B.H.'s return to his parents' custody, provided they met certain terms and conditions. The plan was approved by the juvenile and domestic relations district court in December, 1997. On January 24, 1998, B.H. was once again removed from appellants' home because of their continued abuse of alcohol and their failure to complete parent-nurturing classes prescribed in the Agreement. B.H. was again placed in

foster care, ultimately being placed in the home of Ms. Linda Guyer, where he presently remains.

Heather Trivette, a foster care worker for DSS, contacted B.H.'s sister, Lanina Jackson, following his second removal from appellants' home to determine whether he could be placed in her care. Jackson told Trivette that because of the recent birth of her second child, her home was too crowded to accommodate B.H. and that she was too preoccupied caring for her own two small children to properly supervise him. Later, in August, 1998, Jackson contacted Trivette and told her she would be willing to take custody of B.H., provided appellants paid support for his care.

Other than appellants and Jackson, B.H.'s only relative in the immediate vicinity of Smyth County is his great aunt, Minnie Brown.[1] Trivette knew of Brown's relationship to B.H., but did not contact her concerning the possibility of placing B.H. in her care. Brown did not contact DSS. However, Brown testified at the hearing with respect to her availability and suitability as a custodian.

On May 8, 1998, DSS filed another foster care plan, changing the plan's goal from returning B.H. to appellants'

---

[1] Trivette's investigation of the Hawthorne family revealed the existence of other relatives in the Washington, D.C., area and in Radford, Virginia, but neither appellants, Lanina Jackson, B.H., nor Minnie Brown was able to provide names or addresses for these persons.

custody to finding an adoptive family for B.H. DSS changed the plan's goal because of appellants' continued abuse of alcohol and their failure to comply with the terms of their previous Agreement.

The circuit court heard evidence on DSS's petition to terminate appellants' parental rights at an ore tenus hearing on December 12, 1998. The evidence included, inter alia, testimony from Trivette, Minnie Brown, B.H.'s foster mother Linda Guyer, and psychologist Ralph Ramsden. Trivette's testimony, in conjunction with that of several other social workers and police officers, established the troubled history of the Hawthorne home, including an on-going pattern of alcoholism and domestic violence.

Minnie Brown testified that she is over sixty years old and that she had been aware of B.H.'s placement in foster care following his initial removal from appellants' custody in February, 1997. She further testified that she had not contacted DSS about gaining custody of B.H. At trial, however, Brown expressed her willingness to take care of B.H. and to adopt him, so long as B.H. "wants to be there." She stated that she "would love to have [B.H.] in her home," that B.H. had been to her home on at least one occasion and that he had already established a friendship with a child of one of her neighbors. Brown further testified that she has an adult son who lives in a

nursing home, another adult son who lives with her, and that she regularly baby-sits for a twenty-month-old child between the hours of 8:00 p.m. and 10:00 a.m. Brown also testified that she had not discussed with B.H. the possibility of him living with her.

Dr. Ramsden testified[2] that he has been a licensed clinical psychologist in Abingdon, Virginia, for ten years. He first met B.H. on May 14, 1998, when B.H. was eleven years old. At that time B.H. was depressed, quiet, very polite, and was trying to adjust to being in foster care. B.H. acknowledged his parents' abuse of alcohol but remained loyal and loving toward them. Ramsden stated that appellants cared for B.H. and that B.H. cared for them as well. Ramsden also stated that because terminating the relationship between appellants and B.H. could be traumatic for B.H., it would be best if B.H. could maintain some contact with his parents. However, he opined that B.H. needed to be in a stable environment, and it would be better for B.H. to be placed for adoption than to be returned to appellants' household. Ramsden stated that a child B.H.'s age models the behavior he sees around him and that continued exposure to appellants' pattern of addiction and violence

---

[2] Dr. Ramsden's testimony was accepted by the court in the form of a written letter, a summary of his testimony before the juvenile and domestic relations district court, and the notes taken by the guardian ad litem during the juvenile and domestic relations district court hearing.

- 5 -

therefore posed a threat to B.H.'s development.  Ramsden stated that in an earlier interview with B.H., when he questioned B.H. concerning his preferences for placement, B.H. indicated his preferences for custody in the following order:  1) return to appellants "with no alcohol"; 2) adoption by Linda Guyer; 3) permanent foster care in Guyer's home; and 4) return to appellants' home with no change in their use of alcohol.

Appellants moved to strike DSS's evidence on the ground that it failed to establish that DSS had "thoroughly" investigated the possibility of placing B.H. with a relative prior to filing the petition to terminate parental rights.  The court overruled the motion to strike, stating that because of the 1998 amendment to Code § 16.1-283, the case law cited by appellants no longer obligated DSS to investigate placement with a relative.  On May 6, 1999, the court entered an order terminating appellants' parental rights, continuing custody of B.H. with DSS, and approving DSS's proposed change of the goal of the foster care plan to adoption.  Appellants noted their appeal to this Court on June 4, 1999.

### ANALYSIS

Appellants contend the circuit court erred in ruling that recent changes to Code § 16.1-283(A) eliminated the duty of DSS to consider placing the child with a relative prior to terminating residual parental rights.  They cite Logan v.

Fairfax County Dept. of Human Dev., 13 Va. App. 123, 409 S.E.2d 460 (1991), and Sauer v. Franklin County Dept. of Soc. Servs., 18 Va. App. 769, 446 S.E.2d 640 (1994), construing Code § 16.1-283(A).  In Logan, we addressed the question of whether a social services agency must investigate placing a child with relatives before a court may grant custody to a third party.  We held that

> under the provisions of Code § 16.1-283(A) the Department [of Social Services] has a duty to produce sufficient evidence so that the court may properly determine whether there are relatives willing and suitable to take custody of the child, and to consider such relatives in comparison with other placement options.

13 Va. App. at 131, 409 S.E.2d at 466.  Thereafter, in Sauer, we addressed whether social services had a duty to investigate placement with relatives prior to termination of parental rights.  We held that "[b]efore termination of parental rights by the court, the agency seeking termination has an affirmative duty to investigate all reasonable options for placement with immediate relatives."  18 Va. App. at 771, 446 S.E.2d at 641.

DSS argues that Logan and Sauer are inconsistent with one another and that the revision to Code § 16.1-283(A) effectively overruled our holding in Sauer, eliminating any duty DSS may have had to investigate placing B.H. with a relative before the court terminated appellants' parental rights.  We disagree that our holding in Sauer has been changed by statutory amendment and

- 7 -

conclude that the court erred in its construction of Code § 16.1-283(A).  However, we find that, on the facts of this case, the court's error was harmless, and we affirm its decision.

Code § 16.1-283(A) states that the "order terminating residual parental rights <u>shall be accompanied by</u> an order continuing or granting custody . . . ."  (Emphasis added).  It reads, in pertinent part:

> Any order terminating residual parental rights shall be accompanied by an order continuing or granting custody to a local board of social services, to a licensed child-placing agency or the granting of custody or guardianship to a relative or other interested individual.  However, in such cases the court shall give a consideration to granting custody to relatives of the child, including grandparents.

Code § 16.1-283(A).

The statute thus requires <u>two</u> orders, issued concurrently: one terminating parental rights, and the other placing custody of the child in a relative or a third party.  <u>Sauer</u> addressed the former; <u>Logan</u> addressed the latter.  Contrary to DSS's contention, our holding in <u>Sauer</u> is consistent with our reading of the statute in <u>Logan</u>.  <u>Logan</u> required that DSS conduct an investigation into placing the child with relatives <u>prior</u> to the court's issuance of an order granting custody.  <u>Sauer</u> held that such an investigation must be made prior to the issuance of an

order terminating parental rights, as the two orders must go hand-in-hand. Thus, according to the principles established in those cases, DSS had a duty to investigate placement of B.H. with relatives <u>before</u> the court could terminate appellants' parental rights.[3]

DSS's reliance on the 1998 revision of Code § 16.1-283(A) to support its view that the legislature has eliminated the duty of DSS to investigate placing a child with a relative prior to the termination of parental rights is misplaced. The amended provision states:

> The local board of public welfare or social services . . . need not have identified an available and eligible family to adopt a child for whom termination of parental rights is being sought prior to the entry of an order terminating parental rights.

Termination proceedings do not necessarily culminate in adoption; when parental rights are terminated, the court may place temporary custody of the child in another party, where warranted, or it may elect to continue custody in the social services agency. Thus, the amendment simply makes clear that

---

[3] Our construction of Code § 16.1-283(A) requiring concomitant orders is borne out by the clear policy of the Commonwealth as <u>parens</u> <u>patriae</u> not to terminate parental rights and duties concerning a child without establishing who shall assume those rights and duties. <u>See</u> <u>Verrocchio v. Verrocchio</u>, 16 Va. App. 314, 318-19, 429 S.E.2d 482, 485 (1993) (doctrine of <u>parens</u> <u>patriae</u> defined as the power of the Commonwealth to watch over the interests of those who are incapable of protecting themselves, and is a protective power uniquely concerned with the rights and interests of children).

termination proceedings and concomitant placements short of adoption may proceed in the absence of DSS's identification of an adoptive family. The amended provision does not state that the court may terminate parental rights if DSS has failed to provide it with "sufficient evidence so that the court may properly determine whether there are relatives willing and suitable to take custody of the child, and to consider such relatives in comparison with other placement options." Logan, 13 Va. App. at 131, 409 S.E.2d at 466. Although DSS asks us, in essence, to equate "custody" with "adoption," we decline to do so. Logan and Sauer thus remain good law following the 1998 revision to Code § 16.1-283(A). For the reasons stated, we find that the trial court erred in concluding that the legislature overruled Sauer by its revision of the statute. We find the error to be harmless, however.

DSS complied with the statutory requirements in the instance of Lanina Jackson, when Trivette, a foster care worker for DSS, contacted Jackson following the second removal of B.H. from appellants' home to determine whether he could be placed in Jackson's care. Jackson told Trivette that because of the recent birth of her second child, her home was too crowded to accommodate B.H. and that she was too preoccupied caring for her own two small children to properly supervise him. Later, in August, 1998, Jackson contacted Trivette and told her that she

would be willing to take custody of B.H., provided appellants paid support for his care. DSS thus investigated placing B.H. with Jackson, as required under our holding in Sauer, before the court terminated appellants' parental rights, and presented evidence to the court concerning Jackson's suitability.

DSS did not similarly investigate Brown. However, the purpose underlying Code § 16.1-283(A) was nevertheless met in this case. The statute requires that the court "give a consideration to granting custody to relatives of the child" prior to terminating parental rights and placing the child in the custody of social services. Brown testified at the ore tenus hearing as to her suitability and willingness to assume custody of B.H. Thus, as required by statute, the trial court was presented with evidence for its consideration as to the suitability of placing B.H. with Brown before it ordered the termination of appellants' parental rights. It is well established in Virginia that a court will not compel "a vain and useless undertaking." Virginia Passenger & Power Co. v. Fisher, 104 Va. 121, 129, 51 S.E. 198, 201 (1905) (citations omitted). Because Brown testified as to her suitability to assume custody of B.H., there was no reason to require DSS to investigate her, as the court had before it all the evidence necessary to consider Brown as a possible custodian. "We do not hesitate . . . where the right result has been reached but the wrong

reason given, to sustain the result and assign the right ground." Beverly Health & Rehab. Servs., Inc. v. Metcalf, 24 Va. App. 584, 596, 484 S.E.2d 156, 162 (1997) (citation omitted). Thus, although the trial court erred in holding that the 1998 revision to Code § 16.1-283(A) eliminated the duty of DSS to investigate placing B.H. with a relative before appellants' parental rights were terminated, this error was harmless.

For the reasons stated, we affirm the court's decision.

Affirmed.

Bumgardner, J., concurring, in part, and dissenting, in part.

I concur in the result reached by the majority, but I do not join in its opinion. In the second half of the opinion, the majority concludes that the trial court did consider placing the child with relatives and complied with all statutory requirements for terminating parental rights. I do not feel it is also necessary to address whether that consideration is a prerequisite to the termination decision.

The decision in Sauer v. Franklin County Dept. of Soc. Servs., 18 Va. App. 769, 446 S.E.2d 640 (1994), said a court must consider custody before deciding termination. However, the case limited itself to its unusual facts: the child, the parent (the father), and the relative (the grandmother) lived together in the grandmother's house.

The statutory amendments since the Sauer decision clarify the procedural schema for termination. Code § 16.1-283(A) is a general overview, and broad termination considerations are now grouped into its first paragraph. Custody considerations now follow in a separate paragraph. The specific requirements for termination are defined in separate subsections that address each of the various factual situations that can arise. The need to consider granting custody to relatives is not an element of proof for any of those situations. The directive to consider

- 13 -

relative placement now appears in the second paragraph of subsection (A), which only addresses custody considerations.

Code § 16.1-283(A) now clearly severs two general topics: termination and custody.  Logic suggests that the issues be separated and addressed in progressive sequence.  The fact that a relative might be a proper custodian cannot increase or decrease the probability that a parent is unfit.  A court need only address placement with a relative if it must sever the parental relationship.  The amendments since <u>Sauer</u> make clear that consideration of placement with a relative is part of the custody decision, not a prerequisite to the termination decision.