COURT OF APPEALS OF VIRGINIA


Present:    Judges Elder, Felton and Senior Judge Willis


SAMUEL L. BAKER, JR. AND
 DEBRA KAYE BAKER
                                                    MEMORANDUM OPINION*
v.        Record No. 1828-05-2                           PER CURIAM
                                                        JANUARY 24, 2006
FREDERICK COUNTY
 DEPARTMENT OF SOCIAL SERVICES


                 FROM THE CIRCUIT COURT OF FREDERICK COUNTY
                            John R. Prosser, Judge

                 (Georgia Rossiter; Dennis J. McLoughlin, Jr.; Hall, Monahan, Engle,
                 Mahan & Mitchell, on briefs), for appellants.

                 (Beth M. Coyne; Fowler Griffin Coyne & Patton, P.C., on brief),
                 for appellee.

                 (Lawrence P. Vance; Vance & Smalls, P.C., on brief), Guardian
                 *ad litem* for the minor children.


        On June 30, 2005, the trial court entered an order terminating the parental rights of

Samuel L. Baker, Jr. (Samuel) and Debra K. Baker (Debra), collectively "the Bakers," to their

son, J.B., and daughters, S.B. and R.B., pursuant to Code § 16.1-283(B) and (C)(2). On appeal,

the Bakers contend the Frederick County Department of Social Services (FCDSS) failed to

investigate, pursuant to Code § 16.1-283(A), the Bakers' relatives as suitable candidates for

custody of the children, and did not provide the trial court with evidence regarding the suitability

of those relatives as custodians. Upon reviewing the record and briefs of the parties, we

conclude this appeal is without merit. Accordingly, we summarily affirm the decision of the trial

court. See Rule 5A:27.

---

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

On October 8, 2003, FCDSS removed J.B., S.B., and R.B. from the custody of the Bakers and placed the children together in a foster home. The removal was based upon inadequate supervision and physical neglect of the children, as well as allegations that Samuel had engaged in child pornography involving S.B. At the time of the removal, J.B. was five years old, S.B. was almost four, and R.B. was one and one-half.

Jill James was the foster care worker for FCDSS assigned to work with the Baker family at the time of the removal of the children. James met with the Bakers several times to discuss visitation arrangements and other issues. The Bakers were unwilling to have Samuel leave the home to permit the possible reunion of the children at home with Debra. James testified that no relative of the Bakers came forward to offer a placement for the children, nor did the Bakers suggest any relative who might be interested in such a placement.

Beginning in January 2004, Jill Falsetti was the foster care worker assigned to the Bakers' case. Samuel was not permitted visitation with the children due to the child pornography allegation. During Debra's visits with the children at the FCDSS office, she behaved inappropriately, was belligerent toward Falsetti and other FCDSS workers, and would not focus upon the children. Debra's visitation with the children was terminated in February of 2004 because of her lack of progress toward the goals of the foster care service plan.

The Bakers lost contact with FCDSS for two months in the early part of 2004. In May of 2004, FCDSS employees learned that the Bakers were living with Samuel's mother, Elizabeth

Seekford, and her husband. By facsimile, the Bakers sent FCDSS a series of documents regarding resuming visitation with the children, but they had no other contact with FCDSS.

In the fall of 2004, Debra left Falsetti a voicemail message concerning the visitation issue. Although the foster care service plan required Samuel to live separately from Debra for the children to be reunified with her, the Bakers continued to live together until August of 2004, when Samuel was arrested upon federal child pornography charges.[1] Other than leaving subsequent voicemail messages for FDCSS workers regarding visitation, Debra had no further contact with FCDSS even though FCDSS petitioned for the termination of the Bakers' parental rights.

Both of the Bakers were evaluated by Bernard Lewis, a clinical psychologist. Lewis issued a parental capacity evaluation report dated February 11, 2004 with regard to Debra. Debra reported to Lewis that her mother had physically abused her as a child, and two family members had molested her by the time she was of the age of two or three. When Debra was seven, her mother left her father and married an alcoholic. Several years later, Debra's mother left the stepfather for another man and took Debra and her siblings to Las Vegas. Debra's mother subsequently abandoned Debra and her siblings at a shelter in Las Vegas. The children were returned to Virginia to the home of Debra's maternal grandmother. Debra then went to live with her father, who physically abused her and encouraged her to have sex with men. Debra was between the ages of fifteen and seventeen at the time. Debra described the experience as her father "selling me to them." Debra told Lewis her two brothers and a sister abused drugs on a regular basis. One of the siblings reportedly had used Debra's name to "run up some bills." To

---

[1] Samuel pled guilty to four federal charges involving child pornography and, on April 6, 2005, was sentenced to serve seventeen and one-half years in prison.

Lewis, Debra identified her grandmother in Harrisonburg as her only support network for parenting.

Lewis issued a parental capacity evaluation regarding Samuel on March 12, 2004. Samuel told Lewis that as a child he lived with his parents and two half-brothers, one of whom had been diagnosed as bipolar and schizophrenic. At age twelve, Samuel went to live with his father, an alcoholic, after his parents divorced. Samuel believed that his father's interest in adult pornography was a cause of Samuel's own later involvement in child pornography. Samuel's father forced Samuel to leave school before graduation. Thereafter, Samuel and his father led a nomadic existence, repeatedly being evicted for failing to pay rent. Samuel told Lewis he was subjected to physical abuse from his father and emotional abuse from Seekford.[2] Samuel also told Lewis he believed Seekford had sexually abused J.B.[3]

At the termination hearing in May of 2005, Seekford admitted that she had been treated in the past for depression and attempted suicide.[4] Seekford also stated that when she left Samuel's father, she did not take Samuel with her even though Samuel's father had abused him. At the termination hearing, Seekford testified that she had not seen J.B. for four years. Seekford had seen S.B. only when she was an infant, and Seekford had never met R.B. Nonetheless, Seekford stated that she would take the Baker children into her home to care for them

---

[2] Samuel's father was no longer living at the time of the termination hearing.

[3] In 2001, J.B. had reported that Seekford's husband had sexually abused him. The local Department of Social Services investigated the allegation and determined it to be unfounded. However, a social worker who provided J.B. with counseling at the time of the allegation stated that J.B.'s behavior was consistent with a child who had been sexually abused.

[4] It was during her mental health treatment that Seekford met Debra, who also was hospitalized for a mental illness. Seekford then introduced Debra to Samuel and encouraged a relationship between them.

permanently "in a heartbeat." Seekford admitted, however, that she had never contacted FCDSS about obtaining custody of the children.

When asked why Seekford had not been considered as a possible placement for the children, Falsetti stated that the Bakers had lost contact with Seekford for a long period of time and that both of the Bakers had "really terrible things" to say about Seekford and her husband. To FCDSS the Bakers suggested no relative who was appropriate for placement of the children. Falsetti testified that FCDSS did make efforts to place the children with a relative, but that the efforts were unsuccessful.[5] Falsetti stated she did not "check out" Debra's grandmothers, with whom Debra had resided at various periods of time.

Debra testified that she told James she had three aunts who would "probably each be willing to take a child."[6] None of the aunts Debra claimed to have identified to FCDSS was present at the termination hearing. Debra admitted she had never given her aunts information to facilitate them making contact with FCDSS. Debra stated that since the removal of the children she had stayed for a period of time with Irene Pennington, one of her grandmothers. Pennington was seventy years old, in poor health, and lived in a one bedroom apartment. Debra's other grandmother, Ruth Thompson, was sixty-six years old. Pennington and Thompson were not present at the termination hearing.

---

[5] In their brief, the Bakers highlight James' statement that she did not personally investigate placement of the children with relatives. However, James was involved with the Bakers' case for only a short period of time after the removal of the children from the home. Falsetti became the foster care worker for the Bakers in January of 2004.

[6] Debra testified she gave FCDSS the names of her aunts on the day the children were removed from the home. However, the FCDSS workers involved in the removal testified they received no information from Debra regarding relatives with whom the children possibly could be placed.

DISCUSSION

When considering termination of a parent's residual rights to a child, "the paramount consideration of a trial court is the child's best interests." Logan, 13 Va. App. at 128, 409 S.E.2d at 463. On review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990). "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (citation omitted).

Pursuant to Code § 16.1-283(A), in a case involving the termination of parental rights, "the court shall give a consideration to granting custody to relatives of the child, including grandparents." Thus,

> [b]efore the court grants custody of a child, under the provisions of
> Code § 16.1-283(A) the Department [of Social Services] has a duty
> to produce sufficient evidence so that the court may properly
> determine whether there are relatives willing and suitable to take
> custody of the child, and to consider such relatives in comparison
> to other placement options.

Logan, 13 Va. App. at 131, 409 S.E.2d at 465. Notwithstanding this requirement, the agency seeking the termination does not have the duty "in every case to investigate the home of every relative of the children, however remote, as a potential placement." Sauer v. Franklin Co. Dep't of Soc. Servs. 18 Va. App. 769, 771, 446 S.E.2d 640, 642 (1994). Nor is the agency required by law to perform "'a vain and useless undertaking.'" Hawthorne v. Smyth County Dept. of Soc. Servs., 33 Va. App. 130, 139, 531 S.E.2d 639, 644 (2000) (citation omitted).

The Bakers do not argue the trial court erred in finding that termination of their parental rights was in the best interests of their children. They contend that the trial court erred in ordering the termination because FCDSS failed to investigate their relatives as potential

candidates for placement of the children and present such evidence to the trial court for consideration.

The primary focus of the Bakers' argument is that FCDSS failed to investigate and present evidence regarding the suitability of Seekford and her husband as custodians for the children. On the contrary, however, the record is replete with evidence, both known to FCDSS and presented to the trial court, demonstrating that Seekford and her husband were not suitable candidates. Seekford had a history of mental illness. She had inflicted abuse upon Samuel as a child and abandoned him to an abusive father. Although the allegation was later determined to be unfounded, one of the children had accused Seekford's husband of sexually abusing him. Samuel told Lewis that he believed Seekford had sexually abused J.B.

Prior to the termination hearing, neither Samuel nor Debra suggested to FCDSS that Seekford or her husband should be considered as potential custodians. In fact, as Falsetti testified, the Bakers had only "really terrible things" to say about Seekford and her husband. Significantly, until the day of the termination hearing, Seekford never conveyed an interest in having the children placed with her. She had not seen the oldest child for four years, knew the middle child only as an infant, and had never met the youngest child. Although Seekford was not obligated to present herself to FCDSS as an alternative placement for the children, see Sauer, 18 Va. App. at 772, 446 S.E.2d at 642, her obvious lack of interest in her own grandchildren was a factor for the trial court to consider in determining whether she was a suitable candidate. Indeed, the record suggests the Bakers had distanced themselves and the children from Seekford prior to their removal from the household and had had no recent contact with her.

Moreover, the trial court had the opportunity to see and hear Seekford testify and evaluate her suitability to serve as custodian for the children. Under the facts and circumstances, the trial court was not required to give further consideration to Seekford merely because the

Bakers resided in her household for a period of time following the removal of the children. Cf. Sauer, 18 Va. App. at 771, 446 S.E.2d at 642 (the Department of Social Services was required to consider as an alternative placement the children's grandmother, who had lived with them and assisted in their care).

The Bakers also contend FCDSS failed to consider and investigate "other relatives," referring specifically only to the three aunts Debra claims to have mentioned to FCDSS.[7] None of the foster care workers involved with the Bakers indicated she had received such information from Debra. In fact, both James and Falsetti testified that the Bakers never offered the names of any relatives who might be suitable placement alternatives. The trial court was entitled to resolve any conflict in the evidence and conclude that Debra did not provide FCDSS with identifying information regarding Debra's aunts. See Akers v. Fauquier County Dept. of Social Servs., 44 Va. App. 247, 264, 604 S.E.2d 737, 745 (2004).

In any event, Debra did not provide her three aunts with contact information for FCDSS. Nor did she have the aunts available at the termination hearing. FCDSS was not required to investigate the home of every relative of the children, especially those whom the Bakers failed to suggest to FCDSS. See Hawthorne, 33 Va. App. at 139, 531 S.E.2d at 644.

## CONCLUSION

In sum, the record demonstrates that FCDSS satisfied its duty under Code § 16.1-283(A) to investigate and present evidence of the suitability of the children's relatives as possible custodians prior to ordering the termination of the Bakers' parental rights. Accordingly, we summarily affirm the decision of the trial court.

Affirmed.

---

[7] The Bakers provide no specific argument that FCDSS should have investigated Pennington or Thompson, Debra's grandmothers. Therefore, we need not consider whether the FCDSS should have investigated them as possible placements.