UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:    Judges Elder, Alston and Senior Judge Willis

TANIA GRANADOS BENITEZ

                                                         MEMORANDUM OPINION[*]
v.      Record No. 1839-12-4                             PER CURIAM
                                                         MAY 21, 2013

ARLINGTON COUNTY DEPARTMENT
  OF HUMAN SERVICES

FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
William T. Newman, Jr., Judge

(Deborah Kramer, on brief), for appellant.  Appellant submitting on
brief.

(Jason L. McCandless, Assistant County Attorney; Deborah S. Olin,
Guardian *ad litem* for minor child, on brief), for appellee.  Appellee
and Guardian *ad litem* submitting on brief.

Tania Granados Benitez (mother) appeals an order terminating her parental rights to her

child, J.G.  Mother argues that the trial court erred by (1) ruling that mother had been unwilling and

unable within a reasonable period of time not to exceed twelve months from the time that the child

was placed in foster care to remedy substantially those conditions which led to foster care placement

because (a) mother had made substantial progress and (b) termination was not in the child's best

interests; and (2) failing to consider granting custody of the child to the maternal grandmother.

Upon reviewing the record and briefs of the parties, we conclude that the trial court did not err.

Accordingly, we affirm the decision of the trial court.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

Mother was a minor child in foster care when J.G. was born in 2009. In January 2011, mother ran away from her foster home with J.G. During this time, mother and J.G. lived with mother's boyfriend at his parents' house. Mother admitted to abusing alcohol and using illegal drugs. Mother and J.G. were not located until May 2011.

Once mother and J.G. were found, the Arlington County Department of Human Services (the Department) placed mother in detention. Mother had called her parents to take care of J.G. The Department removed J.G. from the maternal grandparents' care because it was an "unsafe environment." The Department had concerns about (1) the paternal grandfather who allegedly physically abused mother, (2) a gang-affiliated female who threatened mother, and (3) reports that mother's brother, who lived with the maternal grandparents, was involved in a gang.

The Department received legal custody of J.G. and placed her in foster care. Upon her release from detention, mother was placed in a foster home, separate from J.G.

Maternal grandmother filed a petition for custody of J.G., and on August 4, 2011, the juvenile and domestic relations district court (the JDR court) dismissed the petition because "mother objects and grandparent cannot show harm to child if custody is not granted to them [sic] and under the best interest statute it is not in the best interest to grant custody to grandmother."

After mother was released from detention, she regularly visited with J.G. The Department worked with mother on a goal of reunification.

In October 2011, mother participated in a psychological evaluation. She was diagnosed with major depressive disorder, alcohol abuse, and borderline intellectual functioning. The

psychologist recommended individual therapy, substance abuse treatment, psychiatric evaluation, parenting support services, vocational assessment and counseling, a physical exam, and academic support.

In November 2011, mother began individual therapy, but stopped in January 2012 because she did not think that she needed assistance. During the same time period, she attended some parenting classes, but did not complete them.

While in foster care, mother corresponded with unknown males on Facebook and left her foster home in the middle of the night without permission and without her foster mother's knowledge.

During the Christmas holidays, mother visited her parents. She left the house without permission to see her boyfriend. Mother and her boyfriend were engaged in a physical altercation. Although mother was injured, she refused medical treatment.

On January 2, 2012, mother signed herself out of foster care. At first she stayed in a room in Woodbridge, but shortly thereafter, she returned home to her parents.

The Department sought to change the foster care goal to adoption because mother was "not able to adequately care for [J.G.'s] daily needs due to impaired judgment, untreated mental health concerns, and inconsistent parenting." The Department explored the possibility of a relative placement with the maternal grandparents, but noted their unsuccessful attempt to obtain custody previously.

On February 16, 2012, the JDR court approved a change in goal to adoption, but did not terminate mother's parental rights until June 14, 2012.[1] Mother appealed to the circuit court.

Before the trial in the circuit court, mother moved and rented a room in Arlington. She earned money by babysitting several children at her parents' house. Mother also started seeing a

---

[1] The JDR court terminated the parental rights of J.G.'s father. He did not appeal.

counselor. At the time of the trial, mother was eight months pregnant. She testified that she had not consumed any alcohol or smoked a cigarette during her pregnancy.

The social worker testified that J.G. was doing well in foster care and was placed with a prospective adoptive parent.

After hearing the parties' evidence and argument, the trial court terminated mother's parental rights pursuant to Code § 16.1-283(C)(2). This appeal followed.

ANALYSIS

"Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986) (citations omitted).

*A. Termination of parental rights*

*1. Code § 16.1-283(C)(2)*

The Department placed J.G. in foster care because mother left her foster home in Richmond without notice and took J.G. to Woodbridge. The Department did not know of their whereabouts for approximately four months.

Mother argues that the trial court erred in terminating her parental rights because she had made progress toward remedying the situation which led to J.G.'s placement in foster care.

The trial court terminated mother's parental rights pursuant to Code § 16.1-283(C)(2), which states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

The Department offered numerous services to mother. For example, it offered to assist her with obtaining her G.E.D. and vocational training. It recommended that she participate in parenting classes and therapy.

Mother contends she completed parenting classes, participated in therapy, tested negative for drugs, was taking a pre-G.E.D. class, worked as a babysitter, and lived in appropriate housing. However, the Department remained concerned about the stability and safety of mother's housing, as well as mother's ability to provide and care for J.G. Mother lost her job at a restaurant and was babysitting at her parents' house. She moved out of her parents' house and rented a room, but her mother testified that she rented the room so that she could tell the court that she had a separate residence. She was having difficulty obtaining her G.E.D. because the classes were "hard." She faced additional problems because she was an undocumented immigrant.

> [S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes. Considerably more "retrospective in nature," subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services.

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005) (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

Upon issuing its ruling, the trial court noted that mother "has started to make some changes. . . . But I have to say that the changes have not substantially in my mind remedied the situation and that's what the statute says, it has to substantially, and I don't see that and that's unfortunate." The trial court found that the Department provided appropriate services to mother, but "she didn't avail herself of those services."

Based on the record, the trial court did not err in terminating mother's parental rights because mother had not substantially remedied the situation which led to J.G. being placed in foster care.

## 2. *Best interests of the child*

Mother argues that the trial court erred in terminating her parental rights because the termination was not in J.G.'s best interests. Mother admits that her trial attorney did not preserve this issue, but asks that the Court consider her argument pursuant to the ends of justice exception to Rule 5A:18.[2]

"In order to avail oneself of the exception, a *defendant must affirmatively show* that a miscarriage of justice has occurred, not that a miscarriage might have occurred." Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997) (emphasis added).

Assuming without deciding that the ends of justice exception applies to this case, the trial court did not err in finding that termination of parental rights was in the best interests of the child. The trial court stated,

> [W]e have to look at what is in the best interest of this child at this time, and at some point there has to be some closure as to what should happen here, and I think the best interest at this time for this child would be to go ahead and find that she is going to know where she's going to be and who she's going to be with.

The child had been in the Department's custody for approximately sixteen months. The social worker testified that J.G. was doing well and was in a home with a prospective adoptive parent. There was evidence that although mother had started taking steps to improve her situation, she still needed to do a lot of work.

---

[2] "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." Rule 5A:18.

"It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

Considering the circumstances, the trial court did not err in finding that termination of mother's parental rights was in the child's best interests.

### B. Relative placement

Mother argues that the trial court erred by not considering the maternal grandmother as a possible relative placement pursuant to Code § 16.1-283(A).[3]

Mother admits that she did not preserve this issue and asks the Court to invoke the ends of justice exception to Rule 5A:18.

Assuming without deciding that the ends of justice exception applies to this case, the trial court did not err. The maternal grandmother testified that she would be willing to take custody of J.G. However, she also testified that although she was separated from her husband who had a history of abusing mother, her husband continued to live in the same house as maternal grandmother. There were eight people living in the house. Furthermore, maternal grandmother stated that she was not aware of one of her sons allegedly being involved in a gang and did not learn that another son was involved in a gang until he was incarcerated for gang involvement.

The trial court received sufficient evidence to evaluate the maternal grandmother as a possible placement for J.G. and did not err in refusing to place J.G. with her. See Hawthorne v. Smyth Cnty. Dep't of Soc. Servs., 33 Va. App. 130, 139, 531 S.E.2d 639, 644 (2000) (the relative testified at trial, so "the trial court was presented with evidence for its consideration as to

---

[3] Before terminating a parent's rights, "the court shall give a consideration to granting custody to relatives of the child, including grandparents." Code § 16.1-283(A).

the suitability" of placing the child with a relative before it ordered termination of the parent's rights).

## CONCLUSION

For the foregoing reasons, the trial court's ruling is affirmed.

<u>Affirmed.</u>